[File No. Cr. 146.]

STATE OF NORTH DAKOTA, Respondent, v. FREDERICK SHEPARD and Fred Paris, Appellants.

(277 N. W. 315.)

144

Opinion filed October 23, 1937.  Rehearing denied February 1, 1938.

*Halvor L. Halvorson* and *Leon W. Halvorson,* for appellants.

*P. O. Sathre,* Attorney General, and *Roy A. Ilvedson,* for respondent.

GRIMSON, Dist. J.   The defendants were convicted in the district court of Ward county of the crime of grand larceny.   Before each defendant was sentenced their attorney made a motion in arrest of judgment on the grounds of error of law arising during the course of the trial and insufficiency of the evidence.   In the case of each defendant that motion was denied and sentence passed.   Immediately thereafter the defendants' attorney made motions on behalf of each defendant for a new trial, which motions were denied.   This is an appeal from the judgment and from the order denying a new trial.

The district court was clearly correct in denying the motion in arrest of judgment.   Such motion can be founded only on some defect,

appearing on the face of the information or indictment, which constitutes a ground for demurrer. Comp. Laws 1913, §§ 10,921, 10,737.

In this case there was no demurrer to the information and the motion in arrest of judgment does not purport to be founded on any ground rendering the information demurrable.

The transcript of the proceedings had upon the trial discloses that a motion for a new trial was made in open court immediately after sentence had been pronounced. The grounds of the motion were: "that the defendants intend to make a motion before the court for a new trial;" "error of law in the decision of questions of law arising during the course of trial;" and "that the verdict is contrary to the law and clearly against the evidence adduced on the trial."

In the briefs and on the oral argument only one contention is advanced by the defendants why the judgment of conviction should be set aside and that is that the evidence is insufficient to sustain the verdict.

The defendants' motion for a new trial was restricted to the grounds stated above. There was no attempt to specify the particulars in which it was claimed the evidence was insufficient. There was merely the general statement that "the verdict was clearly against the evidence introduced on the trial."

It is presumed that a trial was regular and fair and that a verdict of conviction is sustained by the evidence and is correct. A defendant who moves for a new trial on the ground of the insufficiency of the evidence has the burden of pointing out to the trial court wherein the evidence is insufficient to sustain the verdict.

It is elementary that the question presented on an appeal to this court is whether the rulings of the trial court that are challenged were erroneous and, if erroneous, whether they operated to the prejudice of the appellant. An appellant has the burden of presenting a record affirmatively showing error in the trial court.

When a motion for a new trial is made on the ground that the evidence is insufficient to sustain the verdict the movant has the burden of pointing out wherein the evidence is insufficient. In such case the motion is addressed to the sound judicial discretion of the trial court and the appellate court will not interfere unless an abuse of such dis-

cretion is shown. State v. Cray, 31 N. D. 67, 153 N. W. 425; State v. Stepp, 48 N. D. 566, 185 N. W. 812; State v. Weber, 49 N. D. 325, 191 N. W. 610; State v. Vogt, 57 N. D. 335, 221 N. W. 887.

The evidence shows that between about eleven o'clock p. m. on September 18, 1936 and about twelve-thirty a. m. on the morning of September 19, 1936 a Chevrolet truck loaded with ten or eleven large sacks of wool, some hides and metal was stolen from the south side of the 4–0–6 Garage on Central Avenue in Minot, Ward County, North Dakota. The wool was worth approximately $735, and with the hides and metal made the total value of the load $894. About eleven o'clock on the morning of September 19, the two defendants were at Crosby, North Dakota, about 128 miles northwest of Minot. Shepard, the light haired one, inquired of a gas station attendant where the Crosby Hide and Fur Company was located. They hunted up Harry Braun, the manager of the Crosby Hide and Fur Company. They asked him the price of wool and told him they had ten or eleven sacks. The men were together when this talk was had with Mr. Braun. They told him they would be back with the wool on Monday. On Monday morning, September 21, about eight o'clock, both men arrived at the Crosby Hide and Fur Company's place of business pulling a trailer behind their car. On it were three large sacks of wool which were sold to the Crosby Hide and Fur Company. Defendant Paris had the negotiations for the sale, but the other defendant was with him at all times. To pay for this wool, the Crosby Hide and Fur Company gave its check for $156.40 made out to Oscar Burke, the name, Mr. Braun claims, Paris told him to use. Defendant Paris took this check to the bank, endorsed it "Oscar Burke," and cashed it. Soon thereafter a customs inspector picked up the two defendants at an oil station in Crosby for investigation, and they were held until the officials from Minot arrived. The wool sold by these defendants was identified as part of the load stolen. The money was taken from defendant Paris and returned to the bank. On Saturday morning, September 19, about six a. m. the stolen Chevrolet truck with some small gunny sacks of wool and hides and metal was found on a farm near Westhope, about 57 miles northeast of Minot. Later seven sacks of the wool and some metal were found in some buck brush thirty or forty rods off the highway,

twelve miles northwest of Maxbass and some fourteen miles west of the place where the truck was found.

The defendants live at Mohall, forty-eight miles northwest of Minot, about fifteen miles west of where the wool was found in the buck brush, and eighty miles southeast of Crosby. The defendant Shepard had been engaged in the wool business, buying for the Macmillan Company, in Mohall for about two years. The defendant Paris had been assisting him. Both testified, denying any connection with the crime, claiming to have been home between the hours of eleven p. m. September 18 and seven a. m. September 19, 1936. Shepard was corroborated by his wife and by one Burnstad who claims to have been at their home from nine o'clock to about eleven-thirty on the evening of September 18. Paris by his wife only. Defendant Paris claims to have bought the three large sacks of wool for $105 about nine o'clock p. m. Saturday evening, September 19, from a stranger who, he says, brought them to his barn. He claimed he paid for them with money he kept in the house. He says he did not notice the sacks were initialed. He says he planned to sell them to Shepard but could not because Shepard had ceased buying; that he then engaged Shepard to haul the wool for him to Crosby for $10. He explained the trip to Crosby on Saturday morning on the grounds that they wanted to get the Crosby Hide and Fur Company to finance the buying of a carload of iron but found one of the Braun brothers too drunk to talk with so only asked the other one about the prices of wool and other articles. The trip there on Monday morning with the wool was explained by him on the grounds that he again wanted to talk about the financing of iron purchases, and further, that he wanted to bring back lignite coal from Noonan on the trailer. He claims that Harry Braun wrote the check payable to Oscar Burke without any suggestion from him, saying it was to keep the records straight.

On rebuttal, a customs officer, Mr. Shapland, claims that when he was investigating the matter for smuggled wool and asked Mr. Paris why he took the check in an assumed name if there was nothing wrong with the wool, Paris said, "I'll tell you, I don't know but what the wool might be mortgaged or a lien on it, and that is why I had the check to get out that way." This was denied by Paris, and he claimed to have said that the Brauns made the check out that way because they

might have figured the wool might be mortgaged. There is also in the testimony that Paris and Harry Braun knew each other when boys going to school twelve or fifteen years before.

Where evidence is conflicting, and the case has been fairly submitted to the jury under proper instructions, the verdict of the jury becomes a finding of fact, which will not ordinarily be disturbed on appeal. Griffin v. Implement Dealers' Mut. F. Ins. Co. 64 N. D. 146, 205 N. W. 780; Jaszkowiak v. Refling, 62 N. D. 601, 245 N. W. 817; Schulkey v. Brown, 59 N. D. 345, 230 N. W. 6; Kraft v. Martell, 58 N. D. 58, 225 N. W. 79; Hampton v. Ross, 56 N. D. 423, 217 N. W. 845; Grewer v. Schafer, 50 N. D. 642, 197 N. W. 596; Branthover v. Monarch Elevator Co. 42 N. D. 330, 173 N. W. 455; Blackorby v. Ginther, 34 N. D. 248, 158 N. W. 354; 5 C. J. S. 611; 3 Am. Jur., Appeal and Error, p. 444, § 888.

The jury was instructed, among other things, that possession of recently stolen property, unless satisfactorily explained, was a circumstance "tending to show the guilt of the defendants. However, if the explanation given by the defendants seems reasonable to the jury and, after considering all the case, you have a reasonable doubt as to whether the defendants are guilty, then you should acquit them." They were also instructed that if they were satisfied beyond a reasonable doubt that one of the defendants was guilty but were not satisfied beyond a reasonable doubt as to the other defendant then it was their duty to return a verdict of guilty as to the one and not guilty as to the other.

The verdict of conviction by the jury after that direct charge shows the jury were not satisfied with the explanation of the defendants or of either of them and disbelieved them. They were the judges of the facts. They saw and heard the witnesses testify. They could observe their demeanor while testifying. So also did the trial judge. He has confirmed the jury's findings on this matter of fact by denying a motion for a new trial. The findings of the jury and the trial court upon that matter are binding upon this Court when having reasonable support in the evidence. State v. Cray, 31 N. D. 67, 153 N. W. 425, supra; Harmon v. Haas, 61 N. D. 772, 241 N. W. 70, 80 A.L.R. 1131, 33 N. C. C. A. 52; State v. Anderson, 58 N. D. 721, 227 N. W. 220, 65 A.L.R. 1304; Moore v. Schrage, 51 N. D. 858, 201 N. W. 163; Stiehm v. Guthrie Farmers' Elevator Co. 40 N. D. 648, 169 N. W.

318; Odegard v. Haugland, 40 N. D. 547, 169 N. W. 170; Ellis v. Nelson, 36 N. D. 300, 162 N. W. 554; 5 C. J. S. 579; 3 Am. Jur., Appeal and Error, p. 441, § 887.

In considering the evidence, therefore, the version thereof most favorable to the State is the one controlling.

This shows the stealing of the truck with ten or eleven sacks of wool in Minot about midnight between the 18th and 19th of September 1936, and the appearance of the defendants, together, in Crosby about eleven a. m. on September 19 inquiring the price of wool and stating they had ten or eleven sacks which they would bring in on Monday. Mohall is at least thirty miles further from Crosby than it is from Minot, a much larger market place. Seven sacks of the wool were found cached near the highway directly east of and easily accessible from Mohall. A few small sacks of wool were found on the truck abandoned further east near the same highway. On Monday morning about 8:30 a. m. the defendants, again together in Shepard's car, appeared at Crosby with three sacks of the wool. Thus the ten or eleven sacks of wool stolen, being also the amount of wool which the defendants on Saturday said they had, were accounted for. No showing is made that the defendants, or either of them, on Saturday morning had any wool of their own. The defendant, Paris, asked to have the check made out in the name of "Oscar Burke." The defendant, Shepard, heard the talk about the check and knew it was being made out in a fictitious name. Paris endorsed the check with that fictitious name. The proceeds of the check were taken from him by the sheriff. To the customs officer's inquiry Paris said he had had the check made out that way.

Here is possession of recently stolen personal property which reasonable men could find was not satisfactorily explained coupled with suspicious circumstances in connection with the talks and actions of the defendants concerning it. See State v. Rosencrans, 9 N. D. 163, 82 N. W. 422. See note in 101 Am. St. Rep. 481 at 493.

Considering all the evidence and the law applicable thereto we are convinced, not only that the trial court did not abuse its discretion, but also that there is sufficient evidence to sustain the verdict. See State v. Hazer, 57 N. D. 900, 225 N. W. 319.

Affirmed.

CHRISTIANSON, Ch. J., and NUESSLE, J., concur.

BURR, J. (dissenting). The question before us is the sufficiency of the evidence to sustain the verdict. The defendants have no burden of disproof, nor is it sufficient to say the jury judged the facts and was not satisfied with the explanation of the defendants or either of them and therefore the findings are binding upon this court. This court must determine whether there is reasonable support of every finding necessary for conviction beyond a reasonable doubt.

The cases cited in the majority opinion in support of the doctrine of binding effect are all civil cases except State v. Cray, 31 N. D. 67, 153 N. W. 425, and this case states explicitly there must be substantial and competent testimony to sustain the finding before it is binding. "The words 'insufficient evidence' apply to insufficiency of fact as well as of law." Metropolitan R. Co. v. Moore, 121 U. S. 558, 30 L. ed. 1022, 7 S. Ct. 1334. The place of the appellate court in such matters is well set forth in Armstrong v. State, 30 Fla. 170, 11 So. 618, 627, 17 L.R.A. 484; and the appellate court must be satisfied there is such reasonable testimony.

Determination of insufficiency of the evidence is a matter of law. State v. Strong, 52 N. D. 197, 201, 201 N. W. 858, 860. We recognize the effect of a verdict and show deference to the decision of the trial court; but, after all, this court is here to see that justice is done and we cannot shirk this duty by saying the jury passed upon the facts. A new trial should be granted when the evidence is flimsy. State v. Strong, supra. A jury cannot be permitted to say arbitrarily we will reject any and all explanation, otherwise the sufficiency of the evidence would never be reviewable, even by the trial court. As said in State v. Pienick, 46 Wash. 522, 90 P. 645, 648, 11 L.R.A.(N.S.) 987, 13 Ann. Cas. 800:

"While we seriously hesitate to set aside the verdict of a jury for insufficiency of evidence, especially after the trial judge, who saw the witnesses and heard them testify, has refused to do so, we are nevertheless impressed with the conviction that injustice may be done, and that a possibly innocent man may suffer if the judgment in this case is affirmed. The law presumes the innocence of the appellant until his guilt is established beyond a reasonable doubt. We do not feel

that we are invading the province of the jury in holding the evidence before us insufficient to warrant a conviction."

Lack of evidence to prove guilt cannot be supplied by what a jury believes regardless of its oath to determine the case on the evidence presented to it. Robinson v. State, 18 Wyo. 216, 106 P. 24, 27.

The defendants are not charged with receiving stolen property. The state asserts they were in Minot and stole the truck and goods. In beginning the trial the state's attorney said to the jury:

"The State contends that these boys on Friday, September 18th, stole this wool down in front of the 4–0–6 garage, that is, they took the truck that belonged to a certain hide and fur company in Minot, took this truck that was parked outside of 4–0–6 and drove it away. . . ."

There is no other theory. No one testifies that either defendant was in Minot that day nor saw either on the road going to or coming from Minot. The evidence is absolutely silent as to this. No one was seen driving the truck away; and no one knows how soon after 11 p. m. it was taken. The state nowhere intimates that the property may have been stolen by others and that Shepard and Paris were involved in the conspiracy, in which case they would not need to be physically present in Minot.

There is no question but what the defendants lived in Mohall, some forty-eight miles distant from Minot. The truck and its contents were stolen after 11 p. m. of September 18, 1936. It is not a physical impossibility that Shepard and Paris could have taken a fast car or an airplane and travelled to Minot after 11:30 p. m. to steal this truck and its contents, which were taken sometime between 11:00 and 12:30, even though there is nothing to show either of them knew the truck was brought into Minot that night; but it taxes credulity to assume this, and no one claims they did.

But the evidence shows they were not in Minot at that time. Paris testifies positively that he himself was home in Mohall all that night and so does his wife. Of course, the jury must have disbelieved them, as it had a right to do, but if such testimony be disregarded, what is there to show where he was? The defendant Shepard testifies that he was home in Mohall all that night. His wife so testifies and a witness, Burnstad, testifies to being in Shepard's home that evening from ap-

proximately 8 or 9 p. m. to 11:30 p. m. of September 18 and Shepard was there at that time. He was assisting Shepard to set up a base burner on the Friday night immediately preceding Shepard's arrest on Monday the 21st. He had known Shepard all his lifetime and knew when he was arrested. There is absolutely no reason why this young man's testimony should be rejected, and though one may readily suspect the testimony of the defendants and the wives, the testimony of this young man Burnstad should not be ignored entirely.

There is nothing to suggest the presence of the defendants in Minot and their taking of the truck from Minot except surmise and inference based on whatever recent and unexplained possession of stolen property is shown. The conviction in this case rests upon this inference, with a disputed incident which may or may not have some probative effect.

To warrant the inference of guilt from the possession of stolen property the possession must be personal, recent, unexplained, and must involve a conscious assertion of claim to the property. People v. Sturdyvin, 306 Ill. 138, 137 N. E. 593; Kenney v. Com. 199 Ky. 79, 250 S. W. 494; Robinson v. State, 22 Tex. App. 129, 3 S. W. 736; Lehman v. State, 18 Tex. App. 174, 51 Am. Rep. 298; Moreno v. State, 24 Tex. App. 401, 6 S. W. 299; Sisk v. State (Tex. Crim. Rep.) 42 S. W. 985; State v. Morris, 70 Utah, 570, 262 P. 107. "A mere constructive possession is not enough." Underhill, Crim. Ev. 4th ed. § 516. These factors must exist before the jury is permitted to draw any inference that the possessor is the thief. The inference can be deduced only when the possession manifests that the stolen goods came to the possessor by his own act of larceny, or at all events with his undoubted concurrence in the larceny when committed (State v. Smith, 24 N. C. (2 Ired. L.) 402) and the presumption does not apply when other evidence must be resorted to in order to support the conclusion. State v. Graves, 72 N. C. 482.

Recent unexplained possession of stolen property may set in motion the inference that the possessor is the thief; that he got possession at the time of the larceny. However, no presumption arises from the mere possession of the stolen property, but from such possession coupled with the absence of explanation or of anything tending to show it is or may be consistent with honesty. Blaker v. State, 130 Ind. 203, 29 N.

E. 1077, 1078. The mere possession of stolen goods is not prima facie evidence that the person in whose possession they were found stole them. People v. Gassaway, 23 Cal. 51. It may be considered, however, in connection with other evidence. State v. Reece, 27 W. Va. 375.

Being an accessory after the fact (if he had guilty knowledge) would not be sufficient to convict Shepard of the principal offense even if he had possession of the stolen property. Re Ball, 4 N. Y. City Hall Rec. 157. The defendant need not show the possession was acquired lawfully and in good faith, since he may have acquired it unlawfully and in bad faith and by means other than the larceny and still not be guilty of the larceny. State v. Ivey, 196 Iowa, 270, 194 N. W. 262.

The evidence in this case is sufficient to show stolen goods, and, if there be possession, that it was recent. The first time the stolen property was found with either defendant was Monday the 21st. When stolen goods are found with a defendant—in his house, on his person, in his keeping—the explanation he then gives or subsequently gives is the one considered by the jury. When found in his possession, and recently, the jury may infer he stole them unless his explanation, with all other facts shown, raises a reasonable doubt. The statement attributed to the defendants by the witness Braun about having ten or eleven sacks for sale is not such "possession" as sets the inference in motion. It may be used to rebut any explanation given.

When the stolen goods were found in the possession of Paris on September 21 he attempted an explanation, and his explanation is such that reasonable men could well doubt it. About 9 p. m. of the night of the 19th an unknown man, whom he never saw before and never saw since, appeared at his door with wool for sale and he bought from this man at that time the three sacks found in his possession on the 21st, paying cash to him—cash which he happened to have in his home that night. It has the carmarks of a myth—the man coming from nowhere and vanishing to the same place, the mysterious stranger who appears so opportunely at times. The jury could well disbelieve this story. However, in the absence of any proof whatever showing Paris to be anywhere near the scene of the crime in Minot, or connected with a gang of thieves, the inference is just as compatible with the theory of an invention to "explain" receiving stolen property, believ-

ing it to be stolen—in fact, it is much more compatible with that theory. It must be remembered the three sacks found in the "possession" of the defendant were but a portion of the wool stolen. The remainder of the wool was found miles away from Mohall, and the truck still farther away. There is no suggestion that either defendant was anywhere near these places. It is all guess. If more compatible with the latter named crime, has larceny been proved beyond a reasonable doubt?

But whatever may be the probative effect on Paris' fortunes, it certainly cannot be used as an inference against the defendant Shepard. With him the matter is entirely different. The majority opinion practically ignores any denial of possession or explanation of possession on the part of Shepard. It ignores whether Shepard, in fact, ever had such possession of any portion of the stolen property as permits consideration of such inference, and the assumed possession by Shepard dates from the morning of the 21st. No one saw any property with him or under his control until then.

There is a difference between the foundation for the inference as against Paris and the foundation for the inference against Shepard. Paris admits possession on the 19th. Possession may be joint with a proved thief, yet in order to raise against Shepard the inference which follows rcent unexplained possession there must be possession in Shepard. Possession in Paris may be sufficient to raise an inference against him, but conviction of Shepard on the inference arising from the possession by Paris must be based upon proof of joint action in the larceny. Otherwise the inference arising from possession in Paris cannot attach to Shepard. People v. Farone, 221 App. Div. 310, 223 N. Y. S. 353, 355. Here it is shown that where "the evidence fails to show that defendant was at or near the place where the crimes were committed on the night when they were committed, and the only evidence to connect him is the fact that some of the stolen articles were found in the hotel room which he and his companion were occupying," the evidence did not establish his guilt beyond a reasonable doubt and the case was reversed. There was no question that his companion had possession of some of the stolen goods and the explanation of such possession was somewhat fantastic—the usual explanation of purchasing from an unknown person never afterwards seen. The defendant was associated with the one who had possession but the inference of guilt

which attached to his companion because of such possession could not attach to him. Possession in Shepard or joint possession with Paris must be proved first and then the jury is permitted to draw its inference. See also State v. Raymond, 46 Conn. 345, 348.

The presumption of guilt that arises from recent unexplained possession of the stolen property does not attach until the possession is shown. State v. Van Winkle, 80 Iowa, 15, 45 N. W. 388.

There is dispute as to what was said when both defendants drove to Crosby on the 19th. The testimony of Braun, witness for the state, is:

"Q. Did you have any conversation with them?

"A. Well, not much.

"Q. Did you have any? A. Some.

"Q. And did they endeavor at that time to sell you something?

"A. They asked us the price of wool.

"Q. Did you tell them? A. Yes.

"Q. Did they say they had any wool? A. Yes.

"Q. How much did they say they had?

"A. Ten or eleven sacks.

"Q. These two men were together at the time?

"A. Yes.

"Q. What else did they tell you on Saturday?

"A. They said they would be back with the wool.

"Q. When did they say they would be back?

"A. On Monday.

"Q. Is that all that transpired between the firm and them on Saturday?

"A. Yes."

The purpose of the visit to Crosby is not shown except by inference from this testimony. Defendants denied they told Braun they had wool for sale. The version of defendant Paris is that he merely inquired as to prices of iron, metals, wool, and hides, but that he never said anything about selling ten or eleven sacks of wool and that he had no wool at that time. No conversation with Shepard is shown, nor did Braun testify as to conversation with him that day.

However, the jury had a right to assume that the witness Braun told the truth; but it is clear from the subsequent testimony of Braun

that when he speaks of "they" he was referring to Paris only. Braun testified as follows with reference to the deal with Paris on the 21st:

"Q. Is this the man that sold you the wool?

"A. Yes, that is the man.

"Q. That is the man you had your dealings with?

"A. Yes.

"Q. *Altogether in buying the wool?* A. Yes.

"Q. When you said 'they' sold you wool in answer to the state's attorney's question, you didn't mean that you had dealings with this gentleman with reference to buying the wool?

"A. No.

"Q. They were both there, but that is all?

"A. They were both there, but that is all.

"By Mr. Palda:

"Q. *What is the defendant's name that you had the dealings with, that you talked to, up there?*

"A. Paris.

"Q. His name is Fred Paris? A. Yes."

It is clear he had no dealings with Shepard on either day and it is a moral certainty he claimed no conversation with him. Whatever inference may be drawn from Paris' subsequent possession of some of the stolen property, any inference based upon this alleged conversation with Braun on the morning of the 19th certainly cannot be used against Shepard. There is nothing to indicate he even heard the conversation, except Braun's reference to "they." Paris himself testifies that Shepard knew nothing about his receipt of the wool until the evening of the 20th. He says positively Shepard had nothing to do with the receipt of this wool nor with the purchase of the wool; that the first intimation he gave to Shepard was when he went to Shepard's place on the 20th to sell the wool to him.

The record shows without any dispute that for a year or two Shepard had been the agent of the Macmillan Company, in Mohall, buying during the season for the purchase of wool. Paris knew this and from time to time had sold wool to Shepard as such agent. Paris states that when he purchased this wool he did it in the belief he could sell it to Shepard, knowing Shepard to have been in the business. Consequently the evening of the 20th—having been absent from Mohall

most of the day—he interviewed Shepard and learned that Shepard's agency had ceased, that Shepard had turned over his books and records to the company and closed the business for the season. Thus Shepard could not buy it. No one disputes this was the first intimation to Shepard of any wool.

In Shepard's explanation he tells how Paris called on the night of the 20th to sell wool, how he told Paris he could not buy the wool, that he had turned in his books, then Paris asked him to go to Crosby on the next day for the purpose of interesting the Crosby Hide and Fur Company in financing the purchase of scrap iron, in which both defendants were interested, and Paris would take the wool over there, Paris asked him to take his car and drive over to Crosby so that Paris could sell the wool to the Hide and Fur Company there and offered him $10 for the transportation. Shepard agreed to do this and he was paid $10 for this work.

On the morning of the 21st Shepard saw the wool in a trailer at Paris' barn. The record is silent as to whose trailer it was or when the wool was put in the trailer; but it is clear the wool was in the trailer when Shepard came with his coupe and saw the wool for the first time. The trailer was then hitched to Shepard's coupe. This is the only evidence of "possession" in Shepard that the record shows and the first time he had "possession"—a possession which clearly had its inception after the larceny—not at the time of the larceny. The wool was not in Shepard's car, he never exercised ownership over it, he never claimed it as his, no one says he asserted even a limited control over it; but he did drive his own car. This explanation is reasonable and uncontradicted. If his explanation raises a reasonable doubt in the minds of rational men he must be acquitted. McDonald v. State, 56 Fla. 74, 47 So. 485; Mason v. State, 171 Ind. 78, 85 N. E. 776, 16 Ann. Cas. 1212.

Where defendant's explanation of his possession of stolen property is both corroborated and uncontradicted, a conviction cannot be sustained. Tarin v. State, 25 Tex. App. 360, 8 S. W. 473. Here it is corroborated and uncontradicted.

In Jackson v. State, 33 Ga. App. 700, 127 S. E. 622, it is said,

"The offense charged in the indictment being simple larceny, and the guilt of the accused being wholly dependent upon inference arising from possession of the article alleged to have been stolen, and this possession

being shown by uncontradicted and unimpeached testimony to be consistent with his innocence of the offense charged, . . . the conviction of the accused was unauthorized."

The judgment was reversed solely on this ground. In Slaughter v. State, 24 Ga. App. 428, 100 S. E. 774, the court shows that the case is controlled by previous cases in the same court such as Hampton v. State, 6 Ga. App. 778, 65 S. E. 816, and Gibbs v. State, 8 Ga. App. 107, 68 S. E. 742.

In Hampton v. State, 6 Ga. App. 778, 65 S. E. 816, a burglary case, the court said,

"The defendant's guilt of the crime of burglary being wholly dependent upon the inference arising from the possession of stolen goods after the burglary, and this possession being shown by uncontradicted and unimpeached testimony to be consistent with defendent's innocence of burglary, though he may have been guilty of receiving stolen goods, the verdict was contrary to the evidence, and a new trial should have been granted."

In the case at bar Shepard's explanation of this apparent possession on Monday is plain and reasonable enough and is not contradicted or impeached by any direct testimony—in fact, is corroborated completely and fully and the corroboration itself is not impeached or contradicted by any testimony directly referring thereto.

In the case before us there is no distinct and conscious assertion of property by the defendant Shepard. There is not a breath of testimony anywhere showing that Shepard ever claimed any possession of the property or that he ever had any physical possession. A hired man may drive stolen property for his employer, totally unconscious of the fact that his employer stole it, and yet he can be sent to the penitentiary for larceny solely because of the inference which is based upon his alleged possession through the act of driving. A pickpocket, in fear of imminent arrest, may slip a stolen watch into the pocket of an innocent bystander whose explanation of the possession of his stolen property is that he did not know how it got into his pocket and he would be in danger of conviction. It is doubtful if a recorded case can be found where the conviction of a defendant rests solely upon a claim of finding the stolen property in the possession of the defendant. There are always other circumstances which point to the fact that he must have had possession of the property

at the time of the larceny—not subsequent to it—such as presence near place of crime, contradictory statements, flight, attempts to hide or destroy property, and the use of it, as in the Rosencrans Case and the Hazer Case cited in majority opinion.

Witness Braun, who bought the wool from Paris, made out the check to Paris in a name suggested by Paris (though there is some dispute between him and Paris on this point), and Paris took the check to the bank, endorsed the fictitious named, and got the money. There is no testimony whatever that Shepard went with Paris to the bank. No one testifies that Shepard took any interest in cashing the check, and why should he? He had been paid his $10 and that ended his interest in the deal. Even the customs officer, who testifies as to conversations had after the taking of the defendants into custody, shows that his conversations were with Paris. Shepard was not paying very much attention to what was going on or what was being said. True the customs officer says he had "a conversation with Mr. Shepard and Mr. Paris" but when asked "In that conversation with Mr. Paris in the presence of Mr. Shepard" etc., he says "Paris informed me" etc.; further—"that was Paris you had this talk with?" and he said—"Yes, Sir." Shepard could not help but be there for he was in duress. He did not go with Paris to this officer's place of business. He was taken there, and, of course, the conversation was in his presence.

When the deputy sheriff questioned the defendants, Paris told him he bought the wool, but Shepard told him "he didn't know anything about the wool." This is the state's evidence.

The evidence shows conclusively that whatever connection Shepard had with the wool was a connection arising after the larceny. As said in Heed v. State, 25 Wis. 421, 423, "It must be a possession, which the proof disclosing it does not show to have had an origin and inception subsequent to the offense." Here defendant and one Ross were indicted for burglary. Ross had possession of goods stolen during the burglary. He delivered them to a common carrier under a false name for transportation to another town and the next day Heed, accompanied by Ross, called there for the goods and Heed receipted for them in the false name. Heed then had possession of stolen property but the evidence showed when his possession began—the same here. Possession of stolen goods to be of evidentiary value must be a possession conincident with the

crime. Such possession need not be proved by direct evidence and if recent may be inferred; but when the plain uncontradicted evidence shows this possession had its inception at a later date, then "possession" has no evidentiary value whatever as an inference. We followed this rule in the case of State v. Ehr, 64 N. D. 309, 252 N. W. 60. There is no doubt in this case cited the defendant had possession of the stolen property immediately after the larceny and evidence adduced on that trial would "have an important bearing upon a charge of receiving stolen property, knowing it to be stolen." It was insufficient to convict him of the larceny. The first "possession" by Shepard was on September 21. The only testimony on this point shows this possession began then. Reject this testimony as the jury did and there is nothing.

With no possession shown in Shepard and his explanation of his connection with the wool being plain, reasonable, and uncontradicted, and clearly subsequent to the larceny, how can the state claim that the inference involved, based upon vague discussions during the Crosby visits, is sufficient to establish beyond a reasonable doubt that Shepard was in Minot on the night of the 18th and assisted in the stealing of the wool and the truck? An inference supplies certain facts on the theory they exist and relieves the state in the first place from the duty of supplying such facts; "but there must be some basis of fact in the evidence for the presumption, and when it is shown that this basis is nonexistent, it ceases to be a matter of fact and becomes a matter of law." McIntee v. Baker, 66 N. D. 669, 676, 268 N. W. 661. In State v. Crago, 39 S. D. 123, 163 N. W. 561, the appellate court found the possession was reasonably explained and said, "We are satisfied that the evidence is wholly insufficient to sustain the verdict of the jury." This is my view as to Shepard and he should have a new trial.

I am authorized to state that Judge MORRIS joins in this dissent.